RECORD NUMBER: 10-1925

# United States Court of Appeals

*for the*

# Fourth Circuit

**DAVID L. LEMMON, Col., Superintendent of the West Virginia State Police, In his official and individual capacities, et al.,**

*Appellants,*

– v. –

**CHASITY HUTCHISON,**

*Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON**

# OPENING BRIEF OF APPELLANTS

**MICHAEL D. MULLINS**
**ROBERT L. BAILEY, II**
**STEPTOE & JOHNSON, LLP**
**707 Virginia Street, East**
**Charleston, West Virginia 25326**
**(304) 353-8000**

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. <u>10-1925</u>    Caption: <u>Hutchinson v. Lemmon, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>All Defendants - Appellants</u> who is <u>Appellants</u>, makes the following disclosure:
(name of party/amicus)            (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**************************

I certify that on <u>August 26, 2010</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Georgia Lee Gates, Esq.
(CM/ECF participant)

Terri S. Baur, Esq.
(CM/ECF participant)

Leah Macia, Esq.
(CM/ECF participant)

<u>s/Michael D. Mullins (WVSB #77</u>                    <u>August 26, 2010</u>
        (signature)                                            (date)

# TABLE OF CONTENTS

Corporate Disclosure.................................................................................. i

Table of Contents ..................................................................................... ii

Table of Authorities ................................................................................ iii

I.    Jurisdictional Statement.....................................................................1

II.   Statement of the Issues .....................................................................1

III.  Statement of the Case .......................................................................1

IV.   Statement of the Facts.......................................................................2

     A.   Factual background. ....................................................................2

     B.   Procedural background.................................................................5

V.    Summary of the Argument ................................................................6

     A.   Qualified immunity. .....................................................................6

VI.   Argument ...........................................................................................7

     A.   The standard for review of a district court's denial of summary
         judgment. .....................................................................................8

     B.   The district court erred in failing to grant Defendants qualified
         immunity.......................................................................................8

VII. Conclusion ......................................................................................23

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abney v. Coe*,
    493 F.3d 412 (4th Cir. 2007) ..........................................................14

*Anderson v. Creighton*,
    483 U.S. 635 (1987)........................................................... 10, 11, 12

*Bancroft v. City of Mt. Vernon*,
    672 F. Supp. 2d 391 (S.D.N.Y. 2009) ....................................... 17, 23

*Bell v. Wolfish*,
    441 U.S. 520 (1979).......................................................................13

*Brosseau v. Haugen*,
    543 U.S. 194 (2004).........................................................................9

*Clark v. Dunn*,
    195 W. Va. 272, 465 S.E.2d 374 (1995) .........................................23

*Culosi v. Bullock*,
    596 F.3d 195 (4th Cir. 2010) ...........................................................8

*Dalia v. United States*,
    441 U.S. 238 (1979).......................................................................24

*Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*,
    597 F.3d 163 (4th Cir. 2010) .........................................................13

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999) ............................................. 12, 19, 21

*Elliott v. Leavitt*,
    99 F.3d 640 (4th Cir. 1996), *reh'g en banc denied*, 105 F.3d 174 (4th
    Cir.), *cert. denied*, 521 U.S. 1120 (1997) .........................................9

*Graham v. Connor*,
    490 U.S. 386 (1989).......................................................................11

*Groh v. Ramirez*,
    540 U.S. 551 (2004).......................................................................10

*Hall v. Shipley*,
     932 F.2d 1147 (6th Cir. 1991) ........................................................17

*Harlow v. Fitzgerald*,
     457 U.S. 800 (1982)..............................................................................9

*Hogan v. Carter*,
     85 F.3d 1113 (4th Cir. 1996) (*en banc*), *cert. denied*, 519 U.S. 974 (1996)....23

*Hunt v. Hunter*,
     2008 WL 2036703 (E.D. Tex. May 8, 2008), *aff'd*, 301 Fed. Appx. 355
     (5th Cir. Dec. 8, 2008) ........................................................... 17, 23

*J.H. v. W. Va. Div'n of Rehab. Servs.*,
     224 W. Va. 147, 680 S.E.2d 392 (2009) ........................................23

*Johnson v. Jones*,
     515 U.S. 304 (1995)..............................................................................8

*Los Angeles County, Calif. v. Rettele*,
     550 U.S. 609 (2007)..................................................... passim

*Luster v. Ledbetter*,
     647 F. Supp. 2d 1303 (M.D. Ala. 2009).............................. 17, 18, 22

*Maciariello v. Sumner*,
     973 F.2d 295 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993) ..............9, 21

*Malley v. Briggs*,
     475 U.S. 335 (1986)..............................................................................9

*Maryland v. Garrison*,
     480 U.S. 79 (1987)................................................................................9

*Michigan v. Summers*,
     452 U.S. 692 (1981)..................................................... passim

*Mitchell v. Forsyth*,
     472 U.S. 511 (1985)..........................................................................8, 18

*Monroe v. Pape*,
     365 U.S. 167 (1961)............................................................................18

iv

*Muehler v. Mena*,
 544 U.S. 93 (2005)............................................................................ passim

*Parklane Hosiery Co., Inc. v. Shore*,
 439 U.S. 322 (1979)......................................................................21

*Parkulo v. W. Va. Bd. of Probation & Parole*,
 199 W. Va. 161, 483 S.E.2d 507 (1996) ........................................12

*Pearson v. Callahan*,
 129 S. Ct. 808 (2009)............................................................. 9, 10, 11

*Pruitt v. W. Va. Dep. of Pub. Safety*,
 222 W. Va. 290, 664 S.E.2d 175 (2008) ........................................23

*Robles v. Prince George's County*,
 302 F.3d 262 (4th Cir. 2002), *reh'g and reh'g en banc denied*, 308 F.3d
 437 (4th Cir. 2002), *cert. denied*, 538 U.S. 9345 (2003).......................... 12, 13

*Saucier v. Katz*,
 533 U.S. 194 (2001)................................................................. 11, 24

*State v. Chase Secs., Inc.*,
 188 W. Va. 356, 424 S.E.2d 591 (1992) ........................................23

*Swanson v. Powers*,
 937 F.2d 965 (4th Cir. 1991), *cert. denied*, 502 U.S. 1031 (1992) ........... 21, 23

*Taylor v. Waters*,
 81 F.3d 429 (4th Cir. 1996) ...........................................................11

*Washington v. Wilmore*,
 407 F.3d 274 (4th Cir. 2005) ...........................................................8

*White ex rel. White v. Chambliss*,
 112 F.3d 731 (4th Cir), *cert. denied*, 522 U.S. 913 (1997) .............................12

*Will v. Mich. Dep't of State Police*,
 491 U.S. 58 (1989)...........................................................................7

*Wilson v. Kittoe*,
 337 F.3d 392 (4th Cir. 2003) ...........................................................21

*Wilson v. Layne*,
    141 F.3d 111 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999)......................... 18, 19

*Wilson v. Layne*,
    526 U.S. 603 (1999)............................................................................ 11, 12, 23

## Statutes

28 U.S.C. § 1291 ..........................................................................................1

42 U.S.C. § 1983 ................................................................................ 5, 7, 8

W. Va. Const. art. VI § 35 .........................................................................7

## I.     JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.[1]

## II.    STATEMENT OF THE ISSUES

- Whether the district court erred in holding that the applicable constitutional standard was clearly established on the date of the incident in question.

## III.   STATEMENT OF THE CASE

Appellants are the State of West Virginia (as the West Virginia State Police) and certain State Police officers, all Defendants below.  They appeal the district court's denial of their motion for summary judgment.  Therein, Defendants invoked qualified immunity from Plaintiff's unreasonable search and seizure claim under the Fourth Amendment (the individual-capacity Defendants) and under related West Virginia constitutional and common-law tort (all Defendants).

The district court granted Defendants' motion in part but, relevant to this appeal, denied it in part, holding that the right Plaintiff claims Defendants violated was clearly established at the time and so Defendants were therefore not entitled to qualified immunity.  As explained herein, this holding was in error.

---

[1]     (*See also infra* at 8 n.20.)

## IV.    STATEMENT OF THE FACTS

### A.    Factual background.

After an undercover investigation, Defendant State Police officers came to believe that the drug methamphetamine ("meth") was being illegally manufactured at Plaintiff Chasity Hutchinson's Wayne County, West Virginia residence.[2]  One of the officers obtained a valid warrant from the Circuit Court for Wayne County, West Virginia, to search the address for the illegal meth lab.[3]

Defendants believed that service of the warrant would be dangerous because of:  (1) the fact that illegal drugs were known to be on the premises (including indications that illegal drugs were being taken intravenously, which the police consider indicative of an increased likelihood of a violent encounter); (2) Defendants' expectation that they would encounter either the active or recent manufacture of illegal drugs—which carries with it not only the risk of violence, but also the dangers associated with the chemicals and processes used, the fact that the criminal chemists are usually untrained and unsafe amateurs, *etc.*; (3) the fact that Plaintiff's brother, Josh Hutchinson, had been previously charged for conduct associated with the manufacture of illegal drugs; (4) the fact that Josh recently been the subject of a domestic violence investigation; (5) the presence of guns in the house and the neighbors reporting gun shots coming from the property;  (6) the

---

[2]    (J.A. at 49-52 & 1643-44.)

[3]    (*Id.* at 52 & 1643-44.)

fact that Michael Allen, Plaintiff's stepfather, had been convicted of, *inter alia*, a dangerous weapons offense;  and (7) the close proximity of the house to neighbors' houses.[4]

Under the circumstances, the State Police's special response team was used.  On July 8, 2005, Defendants served the warrant at Plaintiff's home.[5]  When the troopers entered the house, they encountered:  Josh Hutchinson (Plaintiff's brother, who was snorting crushed pain pills off of a dinner plate after the effects of a marijuana joint that Plaintiff's stepfather, Michael Allen, had just rolled him were apparently inadequate), Michael Allen (whom they arrested for possession of marijuana), Edward Glenn (Plaintiff's fiancé), and Plaintiff.[6]

Josh initially refused to comply with Trooper White's orders, so Trooper Ogelsby was forced to go to the kitchen to assist Trooper White.[7]  The troopers also eventually had to deal with Josh's claims that he required medical assistance arising out of a previous accident where he had been injured.[8]

---

[4]    (*Id.* at 20-21, 1644 & 1644 n.1.)

[5]    (*Id*. at 1644.)

[6]    (*Id.*)

[7]    (*Id.*;  *see also id.* at 53-54.)

[8]    (*Id.* at 1644.)

When some of the officers encountered Plaintiff, she was in the bathroom and was taking or had just finished taking a shower.[9] They took her and the others to the living room.[10] While a few of those officers guarded the occupants of the house in the living room, two others dealt with Josh, and the remaining troopers continued to search the house, its basement and an adjacent outbuilding for possible additional occupants or secreted dangers (such as a fuming meth lab); discover and secure contraband;[11] and maintain perimeter security.[12] Plaintiff testified that she believes the search took thirty to forty-five minutes, during which time she was required to remain unclothed on the floor in front of her fiancé, brother, stepfather, and the officers in that room.[13]

---

[9]     (*Id.*)

[10]    (*Id.*)

[11]    During their search, Defendants located the laboratory equipment, tools, and precursor chemicals needed to manufacture meth. (J.A. at 50-51 & 52-53.)

[12]    Trooper Arthur explained that it is not unheard of for competing drug dealers, *etc.*, to drive by during such a raid, and occasionally violence results. (J.A. at 56 n.16.) So after assisting with clearing house, Trooper Arthur spent the remaining time posted outside the house maintaining a perimeter. (*Id.*)

[13]    (*Id.* at 1645.) (Regardless of Plaintiff's perceptions as to time, the undisputable evidence establishes that she could not have been nude thirty to forty-five minutes. At 11:41 p.m., sometime before the team entered the home, the CAD (Computer Aided Dispatch) Operations report establishes that an emergency crew was placed on standby to assist if someone were to be injured after the entry into the home. (J.A. at 693-94). This call necessarily occurred before Defendants went into the house. The EMT's entered the home at 12:02 and it is undisputed that Hutchinson was no longer nude at that point. (*Id.*) Thus, the maximum amount of time Hutchinson could have been nude in the officers presence was twenty-one minutes. Appellants deny that Hutchinson was nude anywhere near twenty-one

4

### B.    Procedural background.

Plaintiff sued, claiming that during service of the warrant, Defendants committed various federal and state constitutional violations and state common-law torts.[14]  After discovery, Defendants moved for summary judgment.  Relevant to the instant appeal, Defendants asserted qualified immunity from Plaintiff's federal constitutional and state constitutional and common-law claims.  The district court granted Defendants summary judgment on many of Plaintiff's claims, but denied Defendants' right to qualified immunity.[15]

As for Plaintiff's state constitutional and common-law claims against the official-capacity Defendants (*i.e.*, against the State of West Virginia), the district court held that Plaintiff's decision to sue the State on claims that the State's sovereign immunity bars was inapplicable in federal court and because this was "a suit under 42 U.S.C. § 1983,"[16] an error beyond the scope of the instant appeal.  As for Plaintiff's federal constitutional and state constitutional and common-law claims, the district court found that under Plaintiff's version of the facts, the Defendant officers had violated Plaintiff's rights by detaining her unclothed longer

---

minutes.  Notwithstanding, Appellants recognize that the Court found the amount of time claimant was nude to be a contested issue.  (J.A. at 1645).

[14]    (*See generally id.* at 26-33.)

[15]    (*See infra* at 6 (explaining Defendants' understanding of Order).)

[16]    (J.A. at 1655-56.)

than was necessary to protect their safety.[17]   The district court held that the governing standard was clearly established on July 8, 2005 (the date of the incident), so Defendants were not entitled to qualified immunity.[18]

Defendants herein appeal the denial of qualified immunity.

## V.     SUMMARY OF THE ARGUMENT

### A.     Qualified immunity.

Assuming *arguendo* that under Plaintiff's version of the facts, Defendants violated the Fourth Amendment by requiring her to remain unclothed in front of her family and a few police officers while they secured the house and a suspected meth lab discovered in that process, the governing standard that leads to that conclusion was not clearly established on the date of the incident. The district court erred by following cases that were not decided until *after* the incident, were from other jurisdictions, or were inapposite. Whatever standard *was* clearly established on July 8, 2005 was inadequately particularized to have put a reasonable officer on notice that what Defendants did that day was unconstitutional. The district court thus erred by holding Defendants to a standard that is far too blunt-edged and abstract.

---

[17]     (*Id.* at 1656-68.)  As the district court noted in its analysis, Plaintiff's state common-law claims largely rise or fall by the same standard as those applicable to her constitutional claims.

[18]     (*Id.* at 1668-73.)

## VI.   ARGUMENT

Although the district court's order purported to grant Defendants' judgment on all official-capacity claims,[19] the analysis preceding that statement was confined to the official-capacity § 1983 claims, clearly barred by *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).  Furthermore, the next paragraph of the order discussed Defendants' motion with respect to their invocation of sovereign immunity under W. VA. CONST. art. VI § 35, and that defense only applies to official-capacity claims.

Accordingly, to be clear, Defendants understand that the district court's order resolved Defendants' motion in the following manner:

- as to Plaintiff's § 1983 claims against Defendants in their official capacities:  granted—the correct result, as conceded by Plaintiff and as necessary under *Will* (*see* J.A. at 1654-55)

- as to Plaintiff's state-law claims (constitutional and common-law) against Defendants in their official capacities:  denied—a result that was in error because Defendants in their official capacities are entitled to qualified immunity

- as to Plaintiff's federal constitutional claims and state claims constitutional and common-law (*i.e.*, all claims) against Defendants in their individual capacities:  denied—a result that was in error because Defendants in

---

[19]    (*See id.* at 1654-55 ("Accordingly, Plaintiff's official capacity claims are **DISMISSED** and the remainder of this decision resolves Defendants' motion only insofar as Plaintiff's complaint raises claims against Defendants in their individual capacities.").)

their individual capacities are entitled to qualified immunity

### A. The standard for review of a district court's denial of summary judgment.

The district court's holding that the right that Plaintiff claims Defendants violated was clearly established on the day of the incident is a pure question of law. *Cf. Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010).[20]

Because the instant appeal presents pure questions of law, this Court reviews the district court's order denying Defendants' immunity *de novo*. *See Washington v. Wilmore*, 407 F.3d 274, 281 (4th Cir. 2005).

### B. The district court erred in failing to grant Defendants qualified immunity.

The only remaining § 1983 claim against Defendants is what both Plaintiff and the district court have characterized as Plaintiff's "*Rettele* claim" based on Plaintiff's allegation that a few of the officers required her to remain unclothed in her living room for what she variously alleges was thirty to forty-five minutes while they searched and secured the house, its occupants, the premises, contraband, and an outbuilding. *See Los Angeles County, Calif. v. Rettele*, 550 U.S. 609 (2007). Because Defendants are entitled to qualified immunity from that claim, the district court erred in denying Defendants' motion.

---

[20]    Thus, denial of qualified immunity is also amenable to this interlocutory appeal. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

## 1.     The standard for Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  It protects police officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).

Because "officers on the beat are not often afforded the luxury of armchair reflection," *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996), *reh'g en banc denied*, 105 F.3d 174 (4th Cir.), *cert. denied*, 521 U.S. 1120 (1997), courts must recognize "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing . . . warrants," *Maryland v. Garrison*, 480 U.S. 79, 87 (1987).

As Justice Kennedy wrote in *Groh v. Ramirez*, 540 U.S. 551 (2004), in a passage later cited in *Pearson*:

> The central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment.
>
> An officer might reach such a mistaken conclusion for several reasons. He may be unaware of existing law and how it should be applied. Alternatively, he may misunderstand important facts about [his conduct] and assess the legality of his conduct based on that misunderstanding. Finally, an officer may misunderstand elements of both the facts and the law. Our qualified immunity doctrine applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

540 U.S. at 566-67 (Kennedy, J., dissenting) (citations omitted).[21]

Most critical to proper analysis of this issue, the allegedly violated right must be identified with the appropriate level of specificity. It is not enough to say that the right was clearly established in the abstract, as Plaintiff argues and as the district court held here. Instead, it is necessary to ask whether the facts that the

---

[21]   Because the doctrine requires only that police officers conduct themselves reasonably, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Pearson*, 129 S. Ct. at 815 (citations omitted). Thus, regardless of the order or the formulation of the analysis, a police officer is entitled to qualified immunity if "a reasonable officer could have believed" that his conduct under the circumstances with which he was faced was lawful "in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

defendant officer actually confronted put him on notice that his conduct

transgressed a constitutional *bright line*:

> This inquiry, it is vital to note, must be undertaken *in light of the specific context of the case, not as a broad general proposition*; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.
>
> In this litigation, for instance, there is no doubt that [*Graham v. Connor*, 490 U.S. 386 (1989)], clearly establishes the *general* proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. *Yet that is not enough.* Rather, we emphasized in [*Anderson v. Creighton*, 483 U.S. 635 (1987),] "that the right the official is alleged to have violated must have been 'clearly established' *in a more particularized, and hence more relevant, sense*: The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that *his conduct* was unlawful in the situation he confronted. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (emphasis added) (parallel citations

omitted), *overruled on other grounds*, *Pearson*; *see, e.g.*, *Taylor v. Waters*, 81

F.3d 429, 434 (4th Cir. 1996) ("Although the right to be free from seizures not

11

founded upon probable cause was well established prior to Taylor's 1992 arrest, defining the applicable right at that level of generality is not proper.").[22]

This Court has faithfully followed that mandate:

> In determining whether there has been a violation of a constitutional right, we must identify the right "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). "In order for a right to be 'clearly established,' the Supreme Court has instructed that '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " [*White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir.), *cert. denied*, 522 U.S. 913 (1997)] (quoting [*Anderson*]). "Although notice does not require that the 'very action in question has previously been held unlawful,' it does mean that 'in the light of pre-existing law the **unlawfulness must be apparent**.' " *Robles v. Prince George's County*, 302 F.3d 262, 270 (4th Cir. 2002)[, *reh'g and reh'g en banc denied*, 308 F.3d 437 (4th Cir. 2002), *cert. denied*, 538 U.S. 9345 (2003)] (quoting [*Layne*] (internal quotation marks omitted)).

---

[22]     Unlike federal qualified immunity, West Virginia's state-law qualified immunity also applies to the State and official-capacity defendants. *See* syl. pt. 9, *Parkulo v. W. Va. Bd. of Probation & Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996) ("In cases arising under W. VA. CODE § 29-12-5, and in the absence of express provisions of the insurance contract to the contrary, the immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case. However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official will be entitled to immunity when the State is not. The existence of the State's immunity of the State must be determined on a case-by-case basis."). Accordingly, both the individual- and official-capacity defendants are entitled to qualified immunity from Plaintiff's state constitutional claims.

*Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010)

(parallel citations omitted).

 In *Robles*, for example, the Court refused a plaintiff's attempt to define his rights too abstractly:

>  Robles contends that his rights under the Due Process Clause were clearly established by [*Bell v. Wolfish*, 441 U.S. 520 (1979)]. He asserts that a "reasonably well trained officer in the position of the defendants would have known that it was unconstitutional to subject an individual to conditions amounting to punishment." However, as the district court recognized, a greater degree of specificity is required to overcome a defense of qualified immunity. Without such a requirement, "[p]laintiffs would be able to convert the rule of qualified immunity that [the] cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

302 F.3d at 271 (citation omitted) (alterations in original).

 As discussed below, this case better than most any other demonstrates the importance of focusing attention on the reasonableness of the defendant officer's conduct as a reaction to the particular facts before him in light of specific lessons taught by earlier cases, versus generalized constitutional commands like "be reasonable."

**2.    The right that Plaintiff claims was violated was not clearly established with the required specificity on July 8, 2005.**

The district court denied Defendants' claim to qualified immunity, holding that requiring Plaintiff to remain unclothed on the floor of her living room while the officers search the premises violated her Fourth Amendment right to be free from unreasonable searches and seizures, and that the governing standard was clearly established on July 8, 2005.  Assuming *arguendo* for the purpose of this motion that the former holding was correct, the latter clearly was not.  In other words, assuming that the officers violated the constitutional standard set out in *Rettele*, that standard was not clearly established on July 8, 2005.

The district court began the first prong of its qualified immunity analysis by reciting the Fourth Amendment and its "reasonable" requirement, and noting that "Fourth Amendment jurisprudence is, accordingly, governed by a reasonableness standard.  *See, e.g.*, *Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007) (The touchstone of [the Fourth Amendment] inquiry is reasonableness.')."[23] The court then set out an uncontroversial definition of "reasonable":   "the balancing of competing interests."[24]

Next, the court discussed *Michigan v. Summers*, 452 U.S. 692 (1981). In *Summers*, the Supreme Court of the United States conducted a "reasonableness"

---

[23]    (J.A. at 1656.)

[24]    (*Id.*)

balance of the specific circumstances before it in that case supporting the interests of the police (the unlikelihood that the police would use detention for an improper purpose during a search for contraband, for example) versus the interests of the individual (*e.g.*, the fact that an in-home detention was unlikely to bring public stigma on the detainee), and announced a constitutional standard applicable to searches for contraband pursuant to a warrant: " '[F]or Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to **detain the occupants of the premises while a search is conducted**.' "[25]

Here, however, Plaintiff does not argue that she was detained longer than the search for contraband was being conducted. Thus, whatever specific lesson *Summers* taught law enforcement officers in 1981 was satisfied here. Instead, Plaintiff argues something different: specifically, she argues that she was detained *unclothed* too long during a "*Summers* search."[26]

The district court next examined "a particular *Summers* detention" case, *Muehler v. Mena*, 544 U.S. 93 (2005).[27] Like Plaintiff here, Mena did not

---

[25]    (*Id.* at 1656-57 (emphasis added) (citations omitted).)

[26]    (*See id.* at 1659 ("Therefore, the question raised is whether the law enforcement interests articulated in Summers justified the character of the intrusion suffered by Chastity Hutchinson. Did they justify requiring her to remain exposed, for 30 to 45 minutes, in the view of eleven men?") & 1661.)

[27]    (*Id.*)

argue that she was detained beyond the time necessary for the search, as was involved in *Summers*.  Instead, similar to Plaintiff here, Mena argued something more specific:  that "it was objectively unreasonable to confine her to the garage and to keep her in handcuffs during the search."[28]  Reversing the Ninth Circuit, the Supreme Court held that under the circumstances unique to that case, not present in *Summers*, the interests of the police (including "preventing flight," "minimizing the risk of harm to officers"; and facilitating "the orderly completion of the search" during "a search for weapons and a wanted gang member"[29]) outweighed Mena's interests.  Chasity Hutchinson does not argue here that she suffered anything like the same treatment as Mrs. Mena, and so *Muehler*, too, has no application to the instant case—other than to unmistakably demonstrate that specific circumstances yield specific constitutional rules that teach specific lessons.

Finally, the district court discussed *Los Angeles County, Calif. v. Rettele*, 550 U.S. 609 (2007).  There, the police encountered two individuals unclothed while searching a house for three people suspected of fraud and identity theft.[30]  The police forced the two to remain unclothed while they searched, unsuccessfully, for the suspects.[31]  On May 21, 2007, the *Rettele* court announced

---

[28]    (*Id.* at 1660.)

[29]    (*Id.* (quotations and internal quotations omitted).)

[30]    (*Id.* at 1662.)

[31]    (*Id.*)

16

another constitutional standard, again specific to the circumstances presented: To detain a person unclothed longer than necessary to "quickly secure a room upon entry" and "minimize the risk of harm to officers"[32] is unreasonable and, thus, unconstitutional.

Applying this rule to the instant case, the district court held that while Defendants' conduct in requiring Plaintiff to remain unclothed in the bathroom was reasonable, continuing to impose that requirement after removing her to the living room while they searched the rest of the premises was not.[33] While Defendants dispute that they violated the constitution, even if they accept it *arguendo*, they are nonetheless entitled to qualified immunity because **before *Rettele*, neither this Court nor the Supreme Court of the United States had ever set out that rule.**

Certainly, none of the cases that the district court found to be consistent with its holding—*Luster v. Ledbetter*, 647 F. Supp. 2d 1303 (M.D. Ala. 2009); *Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391 (S.D.N.Y. 2009); *Hunt v. Hunter*, 2008 WL 2036703 (E.D. Tex. May 8, 2008), *aff'd*, 301 Fed. Appx. 355 (5th Cir. Dec. 8, 2008), and the Sixth Circuit's decision in *Hall v. Shipley*, 932

---

[32]    (*Id.* (citing at 550 U.S. at 614-15).)

[33]    (*Id.* at 1663-64.)

F.2d 1147 (6th Cir. 1991)[34]—clearly established the constitutional right that

Hutchinson claims Defendants violated.

Except for *Shipley*, these cases were all decided after July 8, 2005—

even well after *Rettele*. Thus, they could not possibly have informed Defendants'

analysis that evening:

> Reliance on decisions issued after the events underlying this litigation, whether the decisions were decided by this court or others, is inappropriate. *See Mitchell v. Forsyth*, 472 U.S. 511, 533-35 (1985). Certainly law enforcement officers need not correctly anticipate future constitutional rulings on pain of personal liability.

*Wilson v. Layne*, 141 F.3d 111, 117 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999)

(parallel citations omitted).[35]

---

[34]    (*Id.* at 1665.)

[35]    In any event, *Shipley* was based on circumstances absent from the instant case. (*See id.* at 1439 ("A district court denied summary judgment, on the nakedness issue, and the Sixth Circuit affirmed. In doing so, the Court cited *Monell* [sic] *v. Pape*, 365 U.S. 167 (1961), holding 'that a reasonable officer in appellant officers' position would have known that requiring an individual to sit naked [for 20 to 30 minutes] ***while exposed to the cold January air*** would violate such individual's 'clearly established' rights.") (emphasis added) (alterations in original) (citation omitted).)

Any lesson that officers *in the Sixth Circuit* should have learned in 1991 would therefore not have changed their conduct in Plaintiff's private living room on a July evening. *See also Luster*, 647 F. Supp2d. 2d at 1306 & 1309 (Mrs. Luster was forced to remain unclothed, not in her living room, but *outdoors*, "in front of her home and in full view of the officers and neighbors") & 1311 (basing denial of qualified immunity on holding that "a reasonable police officer should know that he cannot, without justification, forcibly expose a seized person, completely nude, ***to the public***") (emphasis added).

Furthermore, those cases could not possibly have put Defendants on notice of the legality of their conduct, because none of them is authoritative in the Southern District of West Virginia, where the conduct occurred:

> Further, as noted above, reliance on decisions from other circuits to determine that a given proposition of law is clearly established is inappropriate as a general matter, and we find no basis to depart from the general rule in this instance. Thus, the decisions of the other circuit courts of appeals cannot support a conclusion that the law was clearly established in our circuit.

*Id.* "In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose. . . .' '[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense.' " *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (citations omitted) (alterations in original).

The district court acknowledged at least the former of these problems, but held that *Summers* and *Muehler* alone were adequate to have clearly established the right involved: "*Summers*," the court wrote, "established the balancing test later applied in *Muehler* and, ultimately, in *Rettele*."[36]

---

[36]    (J.A. at 1670.)

But this "balancing test" is nothing other than a barely-polished restatement of the Fourth Amendment.  The district court's ruling says, in effect, "Everything a police officer needed to know about how long he can leave someone unclothed in their living room in front of only her family and other, busy police officers while they secure and search a house, its occupants, contraband, and an outbuilding suspected of being a meth lab, he should have learned reading *Summers* and *Muehler*."

To the extent that *Summers* and *Muehler* do apply to the specific circumstances of this case, however, they did not establish "a more particularized, and hence more relevant," rule for police to follow, but instead set out only "a broad general proposition," that the Fourth Amendment requires balancing the interests of the police against the interests of the individual.  As the district court presaged earlier in its order, that rule is not a specific explanation of, but a mere restatement of, the Fourth Amendment itself:  that the police must be reasonable, *i.e.*, that they must engage in "the balancing of competing interests."[37]

On the other hand, to the extent that *Summers* and *Muehler* set out specific rules (while executing a search warrant for contraband, the police may constitutionally detain the occupants, and while searching a residence for weapons and for a wanted gang member, the police may constitutionally detain the

---

[37]     (*Id.* at 1656.)

occupants handcuffed in a garage), they do not apply to the instant case. The cases did not address the facts present in *Rettele* or here, and thus did not put Defendants on notice of whether their particular conduct was reasonable.

If the constitutional standard governing Defendants' specific conduct was clearly established on July 8, 2005 by *Summers*, then it was clearly established on December 15, 1791, when Virginia (the eleventh state to do so) ratified the Bill of Rights,[38] because *Summers*'s "be reasonable," *i.e.*, "go balance the public and private interests," no more tells police officers whether what they are about to do is constitutional than the Fourth Amendment itself did.

"[W]hen the legality of a particular course of action is open to reasonable dispute, an officer is not liable: under the doctrine of qualified immunity, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993)." *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (parallel citations omitted). "For a right to have been clearly established, 'the "contours of the right" must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional.' *Swanson v. Powers*, 937 F.2d 965, 969 (4th Cir. 1991)[, *cert. denied*, 502 U.S. 1031 (1992)]." *Edwards*, 178 F.3d at 251 (internal citation omitted).

---

[38] *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist, J., dissenting).

Before *Rettele*, a reasonable officer would have read *Summers* and believed that under the Fourth Amendment, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises *while a proper search is conducted*." 452 U.S. at 705 (emphasis added) (footnote omitted). He would have read *Muehler* and believed that "[a]n officer's authority to detain incident to a search is *categorical*; *it does not depend on . . . the extent of the intrusion to be imposed by the seizure*.'" 544 U.S. at 98 (emphasis added) (quoting *Summers*). *Summers* taught officers *that* they can detain; *Muehler* taught officers, under a *specific* circumstance, *how* they can detain.[39]

After *Rettele*, a reasonable officer now knows another specific "*how*": *i.e.*, he knows that he may not detain a subject unclothed any longer than is necessary to secure the scene for safety purposes. But on July 8, 2005, even if Defendants violated Plaintiff's Fourth Amendment right by detaining her unclothed for the entire time that they conducted their search, rather than just long enough to protect their safety, their decision was a bad guess in a gray area.[40] Defendants did

---

[39]     Indeed, as a reading of *Muehler* makes clear, if that case taught Defendants anything, it was that under the circumstances presented here, their conduct *was* reasonable.

[40]     It is worthwhile to note that (all of their other problems notwithstanding) the cases that the district court relied on hardly provided strong support for the result reached. In *Luster*, the district court found the officers' conduct unconstitutional, but nevertheless granted them summary judgment based on qualified immunity,

not violate a clearly established right, and they are therefore entitled to qualified immunity on Plaintiff's claim of unreasonable search and seizure.[41]

## VII. CONCLUSION

Relying primarily on cases that were decided *after* July 8, 2005—including *Rettele* itself (decided in 2007)—the district court concluded that the governing constitutional standard was clearly established on the night of the

---

noting that **because the conduct at issue occurred before *Rettele*, it was not clearly established**. *See* 647 F. Supp. 2d at 1311 ("As the court has made clear, there is no bright line stated, and all that can be said is that the longer a person is left uncovered after the premises are secured and after it is obviously easy to cover her, the more likely it is that her seizure was effectuated in an unreasonable manner."). And in both *Bancroft* and *Hunt*, the courts found the officers' conduct constitutional. *See* 672 F. Supp. 2d at 407-08; 2008 WL 2036703, at *11.

"If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Layne*, 526 U.S. at 618. *See also Hogan v. Carter*, 85 F.3d 1113, 1116 n.3 (4th Cir. 1996) (*en banc*) ("Although there might be instances where a reasonable jurist, but not a reasonable official, would consider particular conduct violative of clearly established law, if a reasonable jurist would not have viewed the defendant's action as violative of clearly established law, then it necessarily follows that the reasonable officer likewise would not have viewed that conduct as violative of clearly established law."), *cert. denied*, 519 U.S. 974 (1996); *Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991) ("Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, it surely must be appropriate when reasonable jurists can do so." (citation omitted)).

[41] As Appellants have already briefed, under West Virginia state law, Defendants are entitled to qualified immunity from both Plaintiff's state constitutional and common-law claims. *See* syl. pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995); *accord* syl. pt. 7, *J.H. v. W. Va. Div'n of Rehab. Servs.*, 224 W. Va. 147, 680 S.E.2d 392 (2009); *see also* syl. pt., *State v. Chase Secs., Inc.*, 188 W. Va. 356, 424 S.E.2d 591 (1992); *Pruitt v. W. Va. Dep. of Pub. Safety*, 222 W. Va. 290, 664 S.E.2d 175, 184 (2008).

incident. But that conclusion was based on a version of the governing standard that is *far* too broad and unrefined to satisfy *Saucier* and its progeny. Although it is true that the "exact" circumstances do not have to have been presented to a previous court for the constitutional standard to have been clearly established therein, it is equally true that the proper analysis is far more finely tuned and gives officers far sharper notice of the right Plaintiff claims they violated than any controlling, pre-July 8, 2005 case gave Defendants here. It is "generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). As demonstrated, this case presents no basis to depart from this sound rule, and Defendants were entitled to qualified immunity.

Accordingly, Defendants respectfully request that the Order of the District Court for the Southern District of West Virginia be **REVERSED**.

**APPELLANTS / DEFENDANTS,**

**By Counsel**

s/Michael D. Mullins

Michael D. Mullins (W. Va. Bar 7754)
Robert L. Bailey (W. Va. Bar 8902) (*on brief*)
707 Virginia St. E, Suite 715
P.O. Box 1588
Charleston, W. Va. 25326-1588
Phone:        (304)353-8000
Facsimile:    (304)353-8180

**STEPTOE & JOHNSON PLLC**
*Of Counsel*

24

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No.** <u>10-1925</u>    **Caption:** <u>David Lemmon, et al. v. Chasity Hutchison</u>

## CERTIFICATE OF COMPLIANCE UNDER FED. R. APP.  P. 32(A)(7)

COUNSEL MUST COMPLETE AND INCLUDE THIS CERTIFICATE IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.

1.    This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

☑    Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman).  Do NOT use sans serif typeface such as Arial or any font which does not have the small horizontal or vertical strokes at the ends of letters).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

<u>MS Word 2007, Times New Roman, 14 point</u>

☐    Twelve point, monospaced typeface (such as Courier or Courier New).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier, 12 point):

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

☐    _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

☑    <u>5,921</u>    Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief)--*Some word processing programs, including certain versions of Microsoft Word, do not automatically count words in footnotes, making it necessary to manually add the word count from footnotes to obtain the total word count*; OR

☐    _____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief.

<u>/s/ Michael D. Mullins</u>                    <u>10/5/10</u>

Signature of Filing Party                            Date

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

> Georgia Lee Gates
> Attorney at Law
> 517 Norman Avenue
> Glen Burnie, MD  21060
> Phone: 304-288-7341
> Fax: 410-487-6802
> <u>georgialeegates@AOL.com</u>


*/s/ Catherine B. Simpson*
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804) 648-3664


Filing and service were performed by direction of counsel